UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

DINA JOHNSON, as Next Friend of
HOLLIS DeANGELO SMITH, III,

                Plaintiff,                  No. 05-CV-71796-DT

vs.                                    Hon. Gerald E. Rosen

CITY OF LINCOLN PARK, and
LINCOLN PARK POLICE OFFICERS
PAUL COCHRAN, MICHAEL KROLL,
ROBERT McFARLAND, and ADAM
RUFFNER,

                Defendants.
_____/

OPINION AND ORDER GRANTING
DEFENDANTS' MOTION FOR SUMMARY JUDGMENT

At a session of said Court, held in
the U.S. Courthouse, Detroit, Michigan
on June 8, 2006_____

PRESENT:  Honorable Gerald E. Rosen
                     United States District Judge

## I. INTRODUCTION

This Section 1983 police excessive force case is presently before the Court on the

Motion of the City of Lincoln Park and four Lincoln Park Police Officers, Paul Cochran,

Michael Kroll, Robert McFarland and Adam Ruffner.[1]  Plaintiff has responded to

---

[1]  The Lincoln Park Public Schools and Lincoln Park High School Assistant
Principal Larry Phillips were also originally named as defendants in this action.

1

Defendants' Motion and Defendants have replied.  Having reviewed and considered the

parties' briefs and supporting evidence, and having discussed this matter with counsel for

the parties on June 1, 2006, the Court determined that oral argument is not necessary.

Therefore, pursuant to Eastern District of Michigan Local Rule 7.1(e)(2), this matter will

be decided on the briefs.  This Opinion and Order sets forth the Court's ruling.

## II. PERTINENT FACTS

This case arises out of events that occurred at Lincoln Park High School on

November 18, 2004.  In November 2004, Plaintiff Hollis DeAngelo Smith ("Smith") was

14 years old and a ninth grader at Lincoln Park High School.  Smith had a history of

disruptive and violent behavior throughout his educational career[2] and had been classified

when he was in Middle School as "emotionally impaired" or "EI."  He was, accordingly,

serviced by the Lincoln Park Public Schools Department of Special Education.  (*See*

Defendants' Ex. 4(d).)  Pursuant to the IEP conducted at the end of his eighth grade,

Smith was placed in general education classes at Lincoln Park High School and received

Resource Room support services.  *Id.*

On November 18, 2004, Smith brought a Nintendo Gameboy hand-held video

game to school.  Smith admitted in his deposition that he knew that Gameboys were not

_____

However, the parties agreed to a settlement and, by stipulation, on April 12, 2006, the
claims against these two defendants were dismissed with prejudice and without costs.

[2] Smith testified in his deposition that he had been suspended more than 10 times,
and perhaps even more than 20 times "as many arguments and fights as I got into."  *See*
Smith Dep., Defendants' Ex. A, pp. 68, 71.

permitted in school.  (Smith Dep., p. 25.)  When his science teacher, Mr. Seluck,

discovered that Smith had the Gameboy, he told Smith to surrender the game to him.  *Id.*

p. 29.  When Smith refused to do so, Mr. Seluck sent him to the Assistant Principal's

office.  *Id.* pp. 25-27.

Assistant Principal Larry Phillips directed Smith to turn over the Gameboy to him

and told him that he could have it back at the end of the day.  Smith refused to relinquish

the game.[3]  Mr. Phillips then tried to reach Smith's mother by phone.  (He testified that he

had hoped that Smith's mother could reason with her son and if not, he intended to tell the

mother to come to the school and take her son home for the day.)  Ms. Johnson, however,

did not answer her phone.[4]  Phillips, therefore, repeated his request to Smith to surrender

his Gameboy.  Smith again refused.  Phillips repeated the directive to surrender the

Gameboy three or four more times.  Each time, Smith loudly refused to do so.  Finally,

Mr. Phillips called Paul Cochran, the liaison officer assigned to the high school by the

Lincoln Park Police Department, to come to the office to assist him.

Cochran, who was dressed in plain clothes, came to the office.  After being

informed by Mr. Phillips as to the nature of the problem, Officer Cochran requested

Hollis Smith to turn the Gameboy over to Mr. Phillips.  Hollis again refused, this time

_____

[3]  Smith testified that he had the Gameboy in his either his jacket or pants pocket.
Smith Dep. pp. 25, 33.

[4]  Mr. Phillips testified that the only contact number the school had for Hollis's
mother was a cell phone and that when he tried to call her, there was no answer and no
voice mail prompt.

3

even more loudly and more forcefully than when he spoke to Mr. Phillips.  Officer

Cochran asked Smith at least three times to turn over the Gameboy and each time Smith

refused.

    At this point, Officer Cochran told Smith that he would have to search him.[5]

According to Mr. Phillips, Cochran told Smith that he was going to give him until the

count of five to decide whether he wanted Cochran to search his pockets.  *See* Phillips

Dep., p. 41.)  Cochran stood in front of Smith, counted to five and then said, "Hollis, are

you going to hand over what you have?"  *Id.*  Hollis again said no, this time "more cocky"

and "more forceful[ly],"at which point, Officer Cochran assisted Smith to stand up,

turned him around, and had Smith put his hands upon the office window-wall.  *Id.*  When

Smith was about to be patted down, Smith took a swing at Officer Cochran.  *Id*. at 45.

*See also* Smith Dep., p.38.[6]  Officer Cochran was able to block the swing and took Smith

to the ground.  *Id.*  Smith continued to struggle and kick.  *Id.  See also* Cochran Affidavit,

Defendants' Ex. B, ¶ 14. As Cochran was attempting to gain control over Smith, Smith

bit him -- twice on his left wrist and once on his left forearm.  *Id.,* ¶ 15.  *See also,* Smith

Dep. p. 40.[7]  At that point, Officer Cochran requested that the school secretary call the

_____

    [5]  The testimony was uniform that Smith had on a short-waisted jacket with
pockets at the time.

    [6]  Mr. Phillips testified that Smith just went off -- "[H]e became like superman.  I
have never seen a kid all of a sudden that size (Smith was at the time about 5'6" tall and
weighed about 130 pounds) [who] could get that strong."  *Id.*

    [7]  Officer Cochran required medical treatment for bites and scratches he received
in the struggle with Smith.  *See* Defendants' Ex. B.

Lincoln Park Police Department for additional assistance.  *Id.* ¶ 16.

Officers Michael Kroll, Robert McFarland and Adam Ruffner responded to the call.  After the officers arrived on the scene, Officer Cochran was able to handcuff Hollis Smith, and once he was handcuffed, Cochran assisted Hollis to his feet and again attempted to check his coat pocket.  *Id.* at ¶ 21.  At this point, Smith again became violent and attempted to head but Cochran.  *Id.* at ¶ 22.  Cochran, therefore, again took Smith to the ground.  *Id.* at ¶ 23.  Smith's continued kicking and thrashing caused Officer McFarland to threaten to use his taser on Smith.  *Id.* at ¶ 24.  *See also* McFarland Dep., Plaintiff's Ex. B, pp. 22-23.  McFarland testified:

> I said this is a Taser, it has 50,000 volts of electricity that runs through it and if I touch you with it, you're going to get an electrical shock.  You need to calm down, let us do what we have to do and we'll get out of here.  If you don't calm down, I'm going to tase you and at that point, I did a try fire which shows the electrical charge and I shut it off as soon as the charge went through.  And [Smith] said okay.  We go back to try to lift him up and as soon as we lifted him up, he started thrashing about again and I said Paul, just step back, I'm going to tase him.

*Id.*

McFarland testified that he gave Smith one more warning to stop fighting, and when Smith did not heed the warning, McFarland tased him lightly on his lower back area.

McFarland explained that with a "dry stun" it depends on how much clothing the person has on and amount of force used in applying the stun.  He had decided just to give Smith a light application so he would get the feeling of it and hoped that that would be

5

enough to get Smith to calm down.  However, because Smith had a jacket on and another shirt underneath, Smith had no reaction to the stun.  *Id.* at p. 25.  Instead, he continued to struggle and thrash and kick, so Officer Cochran again took Smith to the ground.  *Id.* at p. 27.  As Smith continued to struggle with Officer Cochran, McFarland made the decision to tase him a second time.  This time, Officer McFarland applied the taser to Smith's bare skin on his lower torso which had become exposed when his shirt came loose from his pants as he struggled.  *Id.* at 28.  Finally, Smith stopped struggling.  Officer McFarland testified that Smith did not scream or yell, "never made a sound of ouch, never verbalized anything.  He just stopped [struggling]."  *Id.*[8]

Smith admitted that the only injuries he suffered as a result of his struggle with Officer Cochran was a rug burn on his forehead and a small mark on his back where he was tased.  He did not seek medical treatment for either injury and has no lasting scars.  Smith further admitted that neither of the other two officers who came to the school with Officer McFarland, i.e., Officers Kroll and Ruffner, ever touched him.  *See* Smith Dep., p. 58.

Smith was then taken into custody.  He was transported to the Lincoln Park Police Department where he sat in a room for about 30 minutes until his mother arrived.  Smith admitted that no one touched him while he was at the police station.  *Id.* at p. 59.

Smith was ultimately charged in the Wayne County Juvenile Court with

---

[8] Smith admitted in his deposition that he was not hurt by the taser, "It tickled." Smith Dep., p. 58.

6

Assaulting a Police Officer and Resisting Arrest.[9]  He was also suspended from school for

10 days. Smith admitted in his deposition that if he had agreed to voluntarily relinquish

the Gameboy when Assistant Principal Phillips first made the request, none of the events

of November 18, 2004 would have occurred.  *See* Smith Dep., p. 62.

On March 15, 2005, Dina Johnson, Hollis Smith's mother, filed a Complaint on

behalf of her son in Wayne County Circuit Court against the Lincoln Park Public Schools,

Assistant Principal Phillips, the City of Lincoln Park, and Lincoln Park Police Officers

Cochran, McFarland, Kroll and Ruffner.  Defendants timely removed the action to this

Court on federal question grounds under 42 U.S.C. § 1983.  In his Complaint, Plaintiff

alleges a Section 1983 claim of violation of his federal constitutional rights under the

First, Second, Fourth, Fifth, Eighth and Fourteenth Amendments; a claim of violation of

the Michigan Constitution; state law common law claims of assault and battery, false

arrest and imprisonment, malicious prosecution, intentional infliction of emotional

distress, defamation, and a claim captioned "violation of ministerial duties."

As noted above, on April 12, 2006, by stipulation of the parties, all claims against

the Lincoln Park Public Schools and Assistant Principal Phillips were dismissed, with

prejudice.  Additionally, Plaintiff has stipulated in his Response Brief to the dismissal of

his claims under the First, Second, Fifth, Eighth and Fourteenth Amendments as well as

his claims of violation of the Michigan Constitution.  *See* Plaintiff's Response Brief, pp.

---

[9]  According to Plaintiff, none of the complaining parties appeared at the Juvenile
Court hearing and the charges against Smith were dismissed.

7

11-12, 16.  Therefore, the only claims remaining for adjudication are Plaintiff's Section 1983 claim for violation of his Fourth Amendment rights and his state law claims of assault and battery, false arrest/false imprisonment, malicious prosecution, intentional infliction of emotional distress, defamation, and "violation of ministerial duties" against the City of Lincoln Park and Lincoln Park Police Officers Cochran, McFarland, Kroll and Ruffner.  These Defendants now seek entry of summary judgment in their favor on all of Plaintiff's claims.

## III. <u>DISCUSSION</u>

### A. <u>STANDARDS APPLICABLE TO MOTIONS FOR SUMMARY JUDGMENT</u>

Summary judgment is proper "'if the pleadings, depositions, answer to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law.'"  Fed. R. Civ. P. 56(c).

Three 1986 Supreme Court cases -- *Matsushita Electrical Industrial Co. v. Zenith Radio Corp.*, 475 U.S. 574 (1986); *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242 (1986); and *Celotex Corp. v. Catrett*, 477 U.S. 317 (1986) -- ushered in a "new era" in the standards of review for a summary judgment motion.  These cases, in the aggregate, lowered the movant's burden on a summary judgment motion.[10]  According to the *Celotex*

---

[10]"Taken together the three cases signal to the lower courts that summary judgment can be relied upon more so than in the past to weed out frivolous lawsuits and avoid wasteful trials."  10A C. Wright, A. Miller, M. Kane, <u>Federal Practice & Procedure</u>, § 2727, at 35 (1996 Supp.).

8

Court,

> In our view, the plain language of Rule 56(c) mandates the entry of summary judgment, after adequate time for discovery and upon motion, against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof.

*Celotex*, 477 U.S. at 322.

After reviewing the above trilogy, the Sixth Circuit established a series of principles to be applied to motions for summary judgment. They are summarized as follows:

> * The movant must meet the initial burden of showing "the absence of a genuine issue of material fact" as to an essential element of the non-movant's case. This burden may be met by pointing out to the court that the respondent, having had sufficient opportunity for discovery, has no evidence to support an essential element of his or her case.

> * The respondent cannot rely on the hope that the trier of fact will disbelieve the movant's denial of a disputed fact, but must "present affirmative evidence in order to defeat a properly supported motion for summary judgment."

> * The trial court no longer has the duty to search the entire record to establish that it is bereft of a genuine issue of material fact.

> * The trial court has more discretion than in the "old era" in evaluating the respondent's evidence. The respondent must "do more than simply show that there is some metaphysical doubt as to the material facts." Further, "[w]here the record taken as a whole could not lead a rational trier of fact to find" for the respondent, the motion should be granted. The trial court has at least some discretion to determine whether the respondent's claim is plausible.

*Betkerur v. Aultman Hospital Association*, 78 F.3d 1079, 1087 (6th Cir. 1996). *See also, Street v. J.C. Bradford & Co.*, 886 F.2d 1472, 1479-80 (6th Cir. 1989). The Court will apply the foregoing standards in deciding Defendant's Motion for Summary Judgment in

this case.

II.     PLAINTIFF'S CONSTITUTIONAL RIGHTS WERE NOT VIOLATED

Plaintiff Smith makes three claims of violation of his Fourth Amendment rights. First, he claims that there was no justification for Officer Cochran to conduct a search of his person. Next, Plaintiff contends that his arrest was unreasonable and without probable cause. Third, Plaintiff argues that he was subjected to excessive force by Officer Cochran. The Court will address each of these claims *seriatim*.

A.     QUALIFIED IMMUNITY PROTECTS DEFENDANT COCHRAN FROM SUIT BASED UPON THE SEARCH OF PLAINTIFF'S PERSON

Qualified immunity shields public officials who perform discretionary functions from the necessity of defending against tort liability so long as their conduct does not violate clearly established rights of which a reasonable official would have known. *See Fisher v. Harden*, 398 F.3d 837, 842 (6th Cir. 2005), *cert. denied*, 126 S.Ct. 828 (2005). The doctrine is designed to "avoid excessive disruption of government and permit the resolution of many insubstantial claims on summary judgment." *Harlow v. Fitzgerald*, 452 U.S. 800, 818 (1982). It protects "all but the plainly incompetent or those who knowingly violate the law." *Malley v. Briggs*, 475 U.S. 353, 341 (1986). Qualified immunity is an affirmative defense; once asserted, the "burden of proof is on the plaintiff to show that the defendant[s] [are] not entitled to qualified immunity." *Armstrong v. City of Melvindale*, 432 F.3d 695 (6th Cir. 2006) (citing *Sheets v. Mullins*, 287 F.3d 581, 586 (6th Cir. 2002)).

10

Whether qualified immunity applies turns on the "objective legal reasonableness" of the official's action, viewed on a fact-specific, case-by-case basis. *Id.* (citing *O'Brien v. City of Grand Rapids*, 23 F.3d 990, 999 (6th Cir. 1994)).  To analyze claims of qualified immunity, the court uses a two-part test "(1) whether, considering the allegations in a light most favorable to the party injured, a constitutional right has been violated, and (2) whether that right was clearly established."  *Estate of Carter v. City of Detroit*, 408 F.3d 305, 310-11 (6th Cir. 2005) (citing *Saucier v. Katz*, 533 U.S. 194, 201 (2001)).[11]  "The contours of the right must be sufficiently clear that a reasonable official would understand that what he is doing violates that right."  *Anderson v. Creighton*, 483 U.S. 635, 640, 107 S.Ct. 3034 (1987).  If the controlling law is not clearly established, an official cannot be liable, because "a reasonable person would not be expected to know how to structure his conduct to avoid liability."  *Mendoza v. Block*, 27 F.3d 1357, 1361 (9th Cir. 1994).

In determining whether the facts demonstrate a constitutional violation, the

---

[11]  In some Sixth Circuit cases, the Court of Appeals occasionally has employed a three-step qualified immunity analysis, adding a third step to the inquiry "whether the plaintiff has offered sufficient evidence 'to indicate what the official allegedly did was objectively unreasonable in light of the clearly established constitutional rights.'" *See e.g., Champion v. Outlook Nashville, Inc.*, 380 F.3d 893, 901 (6th Cir. 2004), *cert. denied*, 544 U.S. 975 (2005); *Feathers v. Aey*, 319 F.3d 843, 848 (6th Cir. 2003).  However, in cases subsequent to *Saucier*, the Supreme Court has not formally broken up the two steps prescribed by *Saucier* into three steps, *see e.g., Brosseau v. Haugen*, 543 U.S. 194, 125 S.Ct. 596 (2004); *Groh v. Ramirez*, 540 U.S. 551, 563, 124 S.Ct. 1284 (2004), and since the two-step approach comports with the Supreme Court's most recent qualified immunity cases, it is this approach that the Court will apply here.

11

Court's first task is to determine what Fourth Amendment standard governs Officer

Cochran's conduct.  The Fourth Amendment protects "[t]he rights of the people to be

secure in their persons, houses, papers, and effects, against unreasonable searches and

seizures."  *Bd. of Educ. of Indep. Sch. Dist. No. 92 v. Earls*, 536 U.S. 822, 828, 122 S.Ct.

2559, 2564 (2002) (internal quotations omitted).  As a general rule, the reasonableness

requirement of the Fourth Amendment obligates law enforcement officials to obtain a

judicial warrant, issued only on a showing of probable cause, before conducting a search.

*Skinner v. Ry. Labor Executives' Ass'n*, 489 U.S. 602, 619, 109 S.Ct. 1402 (1989).  Even

in those situations were the Court has found it permissible for officers to conduct a search

without a warrant, an officer may, as a general rule, search an individual only when there

is "probable cause to believe that the person to be searched has violated the law."  *Id.* at

629.

But neither the warrant nor the probable cause requirement is a constitutional

prerequisite to a valid search when the government has "special needs" beyond normal

law enforcement that render the requirements impracticable.  *Id.* at 619.  On three

separate occasions, the Supreme Court has recognized that "special needs" exist in the

public school setting, thereby permitting school officials to search a student without a

warrant and without probable cause to believe that the student violated the law.  *See*

*Earls, supra*, 536 U.S. at 838, 122. S.Ct. at 2569 (upholding the constitutionality of

school's policy to randomly drug test students participating in extracurricular activities);

*Vernonia Sc. Dist. 47J v. Acton*, 515 U.S. 646, 664-65, 115 S.Ct. 2386 (1995) (rejecting

12

Fourth Amendment challenge to random drug testing of student-athletes); *New Jersey v. T.L.O.*, 469 U.S. 325, 340-41, 105 S.Ct. 733 (1985) (concluding that the probable cause and warrant requirements are unsuited to the public school setting).

These three decisions teach that students retain a privacy interest while at school but explain that the probable cause and warrant requirements are ill-suited in the school setting because the requirements would overbear school administrators' and teachers' ability to maintain order and insure an environment conducive to learning. The Fourth Amendment's reasonableness inquiry, therefore, must account for "the schools' custodial and tutelary responsibility" over the students entrusted to their care. *Vernonia, supra*, 515 U.S. at 656.

*New Jersey v. T.L.O., supra*, remains the preeminent Supreme Court case discussing fourth amendment rights of school students within the confines of the educational environment and the right of school officials to search an individual student based on a belief that the student violated a school rule. In *T.L.O.*, the Court upheld a vice principal's search of a female student's purse for cigarettes based upon the observations of a teacher. *T.L.O.*, 469 U.S. at 326-29, 105 S.Ct. at 735-36. In formulating a Fourth Amendment standard applicable in such circumstances, the Court concluded:

> [T]he accommodation of the privacy interests of schoolchildren with the substantial need of teacher and administrators for freedom to maintain order in the schools does not require strict adherence to the requirement that searches be based on probable cause to believe that the subject of the search has violated or is violating the law.

13

469 U.S. at 341, 105 S.Ct. at 742.

The Supreme Court specifically indicated a certain deference to the school's interest in an orderly learning environment by adopting a two-part "reasonableness" inquiry. *Id.* In such a case, the Court explained that the lawfulness of the search first depends on whether the official's search was "justified in its inception." *Id.* (quoting *Terry v. Ohio*, 392 U.S. 1, 20, 88 S.Ct. 1868 (1968)). If so, the second inquiry is whether the search was reasonable in scope. *Id.*[12]

A search is justified at its inception "when there are reasonable grounds for suspecting that the search will turn up evidence that the student has violated or is violating either the law or the rules of the school." *T.L.O*, 469 U.S. at 341, 105 S.Ct. at 743. A search is reasonable in its scope "when the measures adopted are reasonably related to the objectives of the search and not excessively intrusive in light of the age and sex of the student and the nature of the infraction." *Id.*

In this case, there is no dispute that Hollis Smith admitted violating school rule by his possession of the Gameboy in school. Smith testified that he had the Gameboy in his pocket when he was in the Assistant Principal's office and when Officer Cochran gave

---

[12] In subsequent cases, in the context of suspicionless drug testing, the Court has employed a three-factor balancing approach to assess the reasonableness of a school's drug-testing policy that implicates Fourth Amendment concerns. *See Vernonia, supra; Earls, supra.* Despite the intervening two cases, *T.L.O.*'s two- part inquiry remains the appropriate standard governing the search of an individual student based on a perceived school rule violation. *See Williams by Williams v. Ellington*, 936 F.2d 881, 885-87 (6th Cir. 1991); *Beard v. Whitmore Lake School Dist.*, 402 F.3d 598 (6th Cir. 2005); *Shade v. City of Farmington*, 309 F.3d 1054,1059-60 (8th Cir. 2002).

him to the count of five to turn it over to Mr. Phillips.  His admitted violation of school rules and his refusal to comply with Officer Cochran's directive to turn the Gameboy over justified the Officer's search of Smith at its inception.

The search was also reasonable in its scope.  Officer Cochran only sought to search Smith's pockets.  Due to the nature of item fitting in Smith's pocket, such a search was not excessively intrusive in light of the age and sex of the student and the nature of the infraction.

Plaintiff argues that because Defendant Cochran was a police officer, and not a school administrator or teacher, the more stringent probable cause standard should apply. While it is true that in *T.L.O.*, the Court did *not* address the question of what standard would apply when a search is conducted by school officials *in conjunction with or at the behest of* law enforcement agencies and expressed no opinion on that subject, *see* 469 U.S. at 341 n. 7, 105 S.Ct. at 744 n. 7, the Sixth Circuit and other courts that have considered this issue, have found that the *T.L.O.* standard is the appropriate standard to apply to school searches done by police officers, as well as school officials.  *See e.g. Beard v. Whitmore Lake School Dist., supra*; *Tartar v. Raybuck*, 742 F.2d 977 (6th Cir. 1984), *cert. denied*, 470 U.S. 1051 (1985);[13] see *also, Cason v. Cook*, 810 F.2d 188 (8th Cir. 1987), *cert. denied*, 482 U.S. 930 (1987); *Wofford v. Evans*, 390 F.3d 318, 325-26

---

[13]  Although *Tartar* predated *T.L.O.*, the Sixth Circuit applied the same reasonable cause standard when addressed the question of a search by a police officer at the behest of a school official.  *Tartar* is cited with approval by the Supreme Court in *T.L.O.  T.L.O.*, 469 U.S. at 332 n. 2, 341 n. 6, 105 S.Ct. at 738-39 n. 2, 743 n. 6.

15

(4th Cir. 2004); *Martens v. District No. 220*, 620 F. Supp. 29 (N.D. Ill. 1985) .

As the Eighth Circuit reasoned in *Cason v. Cook*, a case involving a pat-down

search of an individual student by a police officer done at the request and in the presence

of a school administrator after the administrator questioned the student concerning her

suspected involvement in locker break-ins,

> . . . The uncontradicted evidence showed that Ms. Cook, the school
> official, conducted the investigation of the thefts that had been reported to
> her.  Ms. Jones [the police liaison officer]'s involvement was limited to a
> pat-down search conducted after a coin purse matching the description of
> the one stolen was found and to briefly interviewing [the plaintiff]. . . .
>
> . . .  The imposition of a probable cause warrant requirement based on the
> limited involvement of Ms. Jones would not serve the interest of preserving
> swift and informal disciplinary procedures in schools.  Ms. Jones did not
> conduct any of the initial interviews of the students and participated in a
> pat-down search only after evidence was discovered. . . .
>
> It is clear that the correct standard to apply under the circumstances
> presented in this case is the standard enunciated by the Court in *T.L.O.*:
> Whether the search was reasonable under all of the circumstances.

810 F.2d at 191-92 (emphasis added).

Based on the foregoing, the Court finds that Hollis Smith's Fourth Amendment

rights were not violated when Officer Cochran conducted a pat-down search of Smith's

person.

Even assuming that the search of Smith's person was arguably constitutionally

impermissible, Officer Cochran is nevertheless protected from civil liability if his actions

did not violate "clearly established statutory or constitutional rights of which a reasonable

person would have known." *Harlow v. Fitzgerald*, 457 U.S. 800, 818, 102 S.Ct. 2727

16

(1982).  In order for the law to be "clearly established," the law must "truly compel (not just suggest or allow or raise a question about), the conclusion. . . that what the defendant is doing violates federal law in the circumstances."  *Beard v. Whitmore Lake School Dist., supra*, 402 F.3d at 607 (quoting *Saylor v. Bd. of Educ.*, 118 F.3d 507, 515-16 (6th Cir. 1997) and *Lassiter v. Ala. A & M Univ. Bd. of Trustees*, 28 F.3d 1146, 1150 (11th Cir. 1994)).

The Supreme Court has instructed that for purposes of the "clearly established" inquiry, the analysis "must be undertaken in the specific context of the case, not as a broad general proposition."  *Brosseau v. Haugen*, 543 U.S. 194, 125 S.Ct. 596, 599 (2004).  Accordingly, cases "cast at a high level of generality," will only be sufficient to clearly establish the unlawfulness of a defendant's actions where the conduct at issue is "obviously" a violation based on the prior cases.  *Id.*  This is not such an "obvious" case.

As the Sixth Circuit observed in *Beard v. Whitmore Lake School Dist., supra*, although in *T.L.O.,* the Supreme Court set forth a two-pronged, multi-factor test for school searches that weighs the student's interest in privacy against the school's interest in maintaining a safe learning environment, it

> did little to explain *how* the factors should be applied in the wide variety of factual circumstances facing school officials today.  Accordingly, *T.L.O.* is useful in "guiding us in determining the law in many different kinds of circumstances"; but is not "the kind of clear law" necessary to have clearly established the unlawfulness of the [defendant's] actions. . . .  In fact, this court has previously recognized that "the reasonableness standard articulated in *New Jersey v. T.L.O.*, has left courts later confronted with the issue either reluctant or unable to define what type of official conduct would be subject to a 42 U.S.C. § 1983 case of action."  *Williams v.*

17

> *Ellington*, 936 F.2d 881, 886 (6th Cir. 1991).

402 F.3d at 607-608.

Given the lack of a factual context substantially similar to this case -- i.e., where a police liaison officer is summoned by a school administrator to assist in persuading a student to turn over to the school officials an item that is prohibited by school rule, and conducts a pat down search of a student to secure the prohibited item --  neither *T.L.O*, nor *Vernonia*, nor *Earls*, nor any Sixth Circuit case "truly compelled" Defendant Cochran to realize that he was acting illegally when he attempted to conduct a search of Plaintiff Smith in this case.

Because the Officer's search of Plaintiff Smith did not violate clearly established law, Officer Cochran is entitled to qualified immunity.  Defendants' motion for summary judgment on Plaintiff's Section 1983 based on a constitutionally impermissible search of his person will be granted.

B.      DEFENDANTS HAD PROBABLE CAUSE TO ARREST HOLLIS SMITH

Plaintiff also claims that Defendants violated his Fourth Amendment right to be free from an unlawful arrest/seizure.  The Fourth Amendment requires that probable cause support an arrest.  *Klein v. Long*, 275 F.3d 544, 550 (6th Cir. 2001), *cert. denied*, 537 U.S. 819 (2002).  Thus, "for a wrongful arrest claim to succeed under § 1983, a plaintiff must prove that the police lacked probable cause."  *Fridley v. Horrighs*, 291 F.3d 867, 872 (6th Cir. 2002), *cert. denied*, 537 U.S. 1191 (2003) (citing *Painter v. Robertson*, 185 F.3d 557, 569 (6th Cir. 1999).  "Probable cause exists where there is a

18

fair probability that the individual to be arrested has either committed or intends to commit a crime." *Id.*, 291 F.3d at 872. "Probable cause is assessed from the perspective of a reasonable officer on the scene rather than the 20/20 hindsight, and thus, probable cause determinations involve an examination of all facts and circumstances within an officer's knowledge at the time of the arrest." *Klein, supra*, 275 F.3d at 550 (citing *Kostrzewa v. City of Troy*, 247 F.3d 633, 639 (6th cir. 2001)).

Plaintiff in this case was arrested and charged with assaulting a police officer and resisting arrest. *See* Defendants' Ex. F. Probable cause existed to arrest Smith for both of these crimes.

M.C.L. § 750.81(d)(1) provides that an individual who assaults, batters, wounds, resists, obstructs, opposes, or endangers a person who the individual knows or has reason to know is performing his or her duties is guilty of a felony. M.C.L. § 750.81(d)(2) provides that an individual who assaults, batters, wounds, resists, obstructs, opposes, or endangers a person who the individual knows or has reason to know is performing his or her legal duties causing a bodily injury requiring medical attention or medical care to that person is also guilty of a felony. As used in § 750.81, "person" means a "police officer of the state or of a political subdivision of the state." The term "obstruct" is defined in M.C.L. § 750.81(d)(7)(a) as "the use or threatened use of physical interference or force or a knowing failure to comply with a lawful command." In *People v. Nichols*, 262 Mich. App. 408, 686 N.W.2d 502 (2004), the Michigan Court of Appeals held that evidence that the defendant kicked, bit, pushed and punched police officers during their attempt to

19

arrest him was sufficient to support a conviction for resisting arrest under the statute.

Plaintiff Smith admitted in his deposition that he bit Officer Cochran while Cochran was attempting to subdue him after blocking the punch that Smith threw at the officer in an attempt to resist the pat-down search. Cochran's Affidavit testimony and Affidavit exhibits establishes that Cochran required medical treatment as a result of the bites as well as scratches he sustained during the encounter with Smith. Hollis Smith further testified at deposition that he struggled with Officer Cochran throughout this incident. That testimony is consistent with that of both Officers Cochran and McFarland.

"If an officer had probable cause to believe that an individual has committed even a very minor criminal offense in his presence, he may, without violating the Fourth Amendment, arrest the offender." *Atwater v. City of Lago Vista*, 532 U.S. 318, 354, 121 S.Ct. 1536 (2001). The foregoing evidence of Plaintiff's conduct -- which was committed in Defendants' presence -- establishes that the officers had probable cause to arrest Plaintiff for violation of M.C.L. § 750.81(d) and, pursuant to *Atwater*, no constitutional violation upon for unlawful arrest/seizure occurred.

C.   PLAINTIFF HAS FAILED TO ESTABLISH THE USE OF EXCESSIVE FORCE

Plaintiff also contends that the officers are liable to him for damages pursuant to § 1983 because he claims the officers used excessive force in subduing him and effectuating his arrest. The parties are in agreement as to the force that was actually used in this case: Plaintiff was taken to the floor in the assistant principal's office twice as he

20

struggled and fought with Officer Cochran.  After he was taken to the floor the second time, and after ignoring warnings to cease resisting, he was tasered by Officer McFarland.  By his own admission, Plaintiff suffered no injuries as a result of being tasered, (Plaintiff's own description of the taser was that "it tickled."  Plaintiff's Dep., p. 58), and his only other "injury" was a rug burn as a result of being taken to the floor.[14]

In *Graham v. Conner*, 490 U.S. 386, 109 S.Ct. 1865 (1989), the Supreme Court established a number of guidelines to be followed by lower courts in evaluating claims alleging excessive force in the course of an arrest. First, because these questions involve seizures, the Fourth Amendment "reasonableness" test is the appropriate standard by which such claims are to be judged. 109 S.Ct. at 1871. The Court continued:

> Determining whether the force used to effect a particular seizure is "unreasonable" under the Fourth Amendment requires a careful balancing of "'the nature and quality of the intrusion on the individual's Fourth Amendment interests'" against the counterveiling governmental interests at stake. . . .  Our Fourth Amendment jurisprudence has long recognized that the right to make an arrest or investigatory stop necessarily carries with it the right to use some degree of physical coercion or threat thereof to effect it.

109 S. Ct. at 1871-72. The Court added:

The "reasonableness" of a particular use of force must be judged from the

---

[14]  It is undisputed that Officers Kroll and Ruffner, the other two officers who arrived on the scene with Officer McFarland as "backup," had no physical involvement with Plaintiff.  Plaintiff, nonetheless, seeks to hold these two officers liable for failing to intercede when their colleagues were depriving him of his Fourth Amendment right to be free from unreasonable and excessive force.  However, as set forth below, the Court finds no merit in Plaintiff's claim of excessive force.  Therefore, there is no legally cognizable basis for Plaintiff's claim of liability on the part of Officers Kroll and Ruffner for failure to intervene.

> perspective of a reasonable officer on the scene, rather than with the 20/20 vision of hindsight. . . . The calculus of reasonableness must embody allowance for the fact that police officers are often forced to make split-second judgments – in circumstances that are often tense, uncertain, and rapidly evolving – about the amount of force that is necessary in a particular situation.

109 S.Ct. at 1872.  *See also Walton v. City of Southfield*, 995 F.2d 1331, 1342 (6th Cir. 1993); *Leber v. Smith*, 773 F. 2d 101, 105 (6th Cir. 1985) ("The issue we must address, then, is whether [the police officer's] actions were reasonable under the Fourth Amendment. . . . [c]onsidering [all] factual circumstances surrounding the incident in question . . . .") *cert. denied*, 475 U.S. 1084, 106 S. Ct. 1466 (1986); *Damron v. Pfanens*, 785 F. Supp. 644, 647 (E.D. Mich. 1992).

In *Graham*, the Supreme Court suggested a number of factors that a court may consider in evaluating excessive force claims, including "the severity of the crime at issue, whether the suspect poses an immediate threat to the safety of the officers or others, and whether he is actively resisting arrest or attempting to evade arrest by flight." *Graham*, 490 U.S. at 396.  This list, however, is not exhaustive, as the ultimate question is "whether the totality of the circumstances justifies a particular sort of seizure."  *Id.* The Court, however, made clear that "[n]ot every push or shove, even if it may later seem unnecessary in the peace of the judge's chambers, violates the Fourth Amendment."  *Id.* As the Sixth Circuit observed in *Burchett v. Kiefer*, 310 F.3d 937 (6th Cir. 2002), the Fourth Amendment's reasonableness standard "contains a built-in measure of deference to the officer's on-the-spot judgment about the level of force necessary in light of the circumstances of the particular case." *Id.* at 944.

22

Finally, as the *Graham* court explained, the state of mind of the officers at the time of arrest has no bearing on the reasonableness of their actions at the time of the arrest and, as such, it is reversible error for a lower court to inquire into the officers' subjective state of mind in deciding the reasonableness issue:

> We do not agree with the Court of Appeals' suggestion that the "malicious and sadistic" inquiry is merely another way of describing conduct that is objectively unreasonable under the circumstances. Whatever the empirical correlations between "malicious and sadistic" behavior and objective unreasonableness may be, the fact remains that the "malicious and sadistic" factor puts in issue the subjective motivations of the individual officers, which our prior cases make clear has no bearing on whether a particular seizure is "unreasonable" under the Fourth Amendment. * * * The Fourth Amendment inquiry is one of "objective reasonableness" under the circumstances, and subjective concepts like "malice" and "sadism" have no proper place in that inquiry.

109 S. Ct. at 1872 (citations omitted). *See also, Branham v. City of Dearborn Heights*, 830 F. Supp. 399, 401 (E.D. Mich. 1993).

Applying the foregoing principles to the evidence of record in this case, there is no genuine issue of material fact whether Defendants used objectively reasonable force under the circumstances to subdue Plaintiff and effectuate his arrest. The evidence of record is undisputed -- indeed Plaintiff himself admits as much -- he continuously struggled and resisted the officers and bit Officer Cochran. He admitted that he was warned to stop struggling but refused to do so. He further acknowledged that if had simply turned over the Gameboy when Assistant Principal Phillips had demanded it, none of this would have happened.

Under these circumstances, it is simply impossible to say that the amount of force

23

employed by Officers Cochran and McFarland was unreasonable.  To the contrary, the

Court concludes that the amount of force was reasonable under the Fourth Amendment.

In sum, the Court finds that Plaintiff's Section 1983 claims against Officers

Cochran, McFarland, Kroll and Ruffner for violation of his Fourth Amendment rights fail

as a matter of law.[15]

_____

[15]  As noted above, Plaintiff settled with Assistant Principal Phillips and the Lincoln Park Public Schools and the claims against these defendants were dismissed, with prejudice, prior to the Court's consideration of the parties' motions for summary judgment.  In the Court's view, the School Defendants' agreement to settle with the Plaintiff was a wise decision because had the assistant principal and school system still been parties to this lawsuit at the summary judgment stage, it would have been highly unlikely that the Court would have found in their favor, even under the deferential standard established under *T.L.O.* and its progeny.  The Court believes that this entire incident -- which arose out of Hollis Smith's possession of a "Game Boy" -- could have easily been avoided had Assistant Principal Phillips not escalated the incident by inflaming a student known by the school system to have serious emotional issues and to react angrily and violently when confronted by adult authority.  [*See* IEP Report, Defendants' Ex. 4(d).]  Clearly, had Hollis possessed a firearm or other weapon -- or anything else which could have posed imminent harm to Hollis himself or others in the school -- the school administrators would have been fully justified in taking measures to attempt to have Hollis immediately surrender the contraband.  However, to escalate this matter over a student's possession of a Game Boy -- with the attendant potential for danger to Hollis and others -- hardly seems a prudent exercise of authority or common sense.

As indicated, Hollis was IEP'ed and the school system was well-aware of his behavioral problems and the appropriate protocols for dealing with those problems.   To the extent that Mr. Phillips did not know or was not advised of Hollis' condition and his IEP status as "emotionally impaired," as Mr. Phillips indicated in his deposition testimony, this is clearly a failure on the part of the school, and one that could have had very serious repercussions.  In the Court's view, those who are to be involved with student disciplinary matters should be fully informed about students who the school system itself has specifically designated as meriting special attention and handling.  While the police officers involved could not have been expected to know of Hollis' special needs or have been required to tailor their procedures to those particular needs, the school system and its teachers and administrators certainly knew, or should have known, what was called for under the circumstances.  In this instance, the Court believes that,

D.   AS THE INDIVIDUAL OFFICERS' CONDUCT DID NOT VIOLATE
PLAINTIFF'S CONSTITUTIONAL RIGHTS, PLAINTIFF'S CLAIM OF
MUNICIPAL LIABILITY ALSO FAILS

Having concluded that Plaintiff has not established a violation of his constitutional

rights, Plaintiff's municipal liability claim also must be dismissed.  *See Ewolski v. City of*

*Brunswick*, 287 F.3d 492, 516 (6th Cir. 2002).  It is well-settled that where a

municipality's liability is alleged on the basis of the unconstitutional actions of its

employees, it is necessary to show that the employees inflicted a constitutional harm.

*City of Los Angeles v. Heller*, 475 U.S. 796, 799, 106 S.Ct. 1571 (1986) (""[N]either

*Monell* [*v. Department of Social Services of City o f New York*, 436 U.S. 658, 98 S.Ct.

2018 (1978)]. . . nor any other of our cases authorizes the award of damages against a

municipal corporation based on the actions of one of its officers when in fact the jury has

concluded that the officer inflicted no constitutional harm.")  Because no such

constitutional violation has been shown, summary judgment will also be granted in favor

of the City of Lincoln Park on Plaintiff's Section 1983 claims.

E.   SUMMARY JUDGMENT WILL ALSO BE GRANTED IN FAVOR OF
DEFENDANTS ON PLAINTIFF'S STATE LAW CLAIMS

Plaintiff has also asserted state law claims of assault and battery, false arrest/false

imprisonment, malicious prosecution, intentional infliction of emotional distress,

defamation, and "violation of ministerial duties."

---

inasmuch as *T.L.O.* calls for a reasonableness assessment under a totality of the
circumstances, the School Defendants acted inappropriately in their handling of this
matter.

1.    <u>ASSAULT AND BATTERY</u>

To recover for an assault, a plaintiff must show an "intentional unlawful offer of corporal injury to another person by force, or force unlawfully directed toward the person of another, under circumstances which create a well-founded apprehension of imminent contact, coupled with the apparent present ability to accomplish the contact." *VanVorous v. Burmeister*, 262 Mich. App. 467, 482-483, 687 N.W.2d 132 (2004). To recover for battery, a plaintiff must show a "wilful and harmful or offensive touching of another which results from an act intended to cause such contact." *Id.*

However, where defendants used reasonable force to effect the lawful arrest of the plaintiff, the plaintiff's assault and battery claims cannot withstand summary judgment. *See, Kahlich v. City of Grosse Pointe Farms*, 120 Fed. Appx. 580, 586 (6th Cir. 2005) (citing *Brewer v. Perrin*, 132 Mich. App. 520, 349 N.W.2d 198, 202 (1984)).

As set forth above in the discussion of Plaintiff's Section 1983 claims, Defendants in this case used reasonable force under the circumstances to subdue Plaintiff and effectuate his arrest. Therefore, the Court will dismiss Plaintiff's assault and battery claim.

2.    FALSE ARREST/FALSE IMPRISONMENT AND MALICIOUS
      <u>PROSECUTION</u>

False imprisonment is the "unlawful restraint on a person's liberty or freedom of movement." *Peterson Novelties, Inc. v. City of Berkley*, 259 Mich. App. 1, 17, 672 N.W.2d 352 (2003). False arrest is an "illegal or unjustified arrest, and the guilt or

26

innocence of the person arrested is irrelevant." *Id.* To prevail on a false arrest and/or false imprisonment claim, the plaintiff must show that the arrest was illegal, meaning it was not based on probable cause. *Peterson, supra*, 259 Mich. App. at 18. Lack of probable cause is also a necessary element of a claim of malicious prosecution. *Walsh v. Taylor*, 263 Mich. App. 618, 689 N.W.2d 506 (2004); *Peterson, supra.* Thus, if the defendants had probable cause to arrest the plaintiff, his false arrest/false imprisonment and malicious prosecution claims must be dismissed. *See Kahlich, supra*, 120 Fed. Appx. at 586; *Lewis v. Farmer Jack, Inc.*, 415 Mich. 212, 327 N.W.2d 893, 894 (1982).

As set forth above, the defendant-officers in this case had probable cause to arrest Plaintiff for assaulting a police officer and resisting arrest. The fact that these charges were ultimately dismissed is irrelevant. *See Peterson, supra.* Because there was probable cause to arrest Plaintiff, his false arrest/false imprisonment claim fails as a matter of law.

3.    INTENTIONAL INFLICTION OF EMOTIONAL DISTRESS

The Michigan Supreme Court has never adopted the tort of intentional infliction of emotional distress into Michigan jurisprudence. *See Smith v. Calvary Christian Church*, 462 Mich. 679, 686 n. 7, 614 N.W.2d 590, 593 n. 7 (2000); *Roberts v. Auto Owners Ins. Co.*, 422 Mich. 594, 602, 374 N.W.2d 905, 907 (1985); *Khalifa v. Henry Ford Hospital*, 156 Mich. App. 485, 499, 401 N.W.2d 884, 890 (1987); *Andrews v. Prudential Securities, Inc.*, 160 F.3d 304, 309 (6th Cir.1998). However, the Michigan Court has described the standards that would have to be met for satisfaction of such a claim:

27

The cases thus far decided have found liability only where the defendant's conduct had been extreme and outrageous.  It has not been enough that the defendant acted with an intent which is tortious or even criminal, or that he had intended to inflict emotional distress, or even that his conduct has been characterized by "malice", or a degree of aggravation which would entitle the plaintiff to punitive damages for another tort.  Liability has been found only where the conduct has been so outrageous in character, and so extreme in degree, as to go beyond all bounds of decency, and to be regarded as atrocious, and utterly intolerable in a civilized community.  Generally, the case is one in which the recitation of the facts to an average member of the community would arouse his resentment against the actor, and lead him to exclaim, "Outrageous!"

The liability clearly does not extend to mere insults, indignities, threats, annoyances, petty oppressions or other trivialities.  The rough edges of our society are still in need of a good deal of filing down, and in the meantime, plaintiffs must necessarily be expected and required to be hardened to a certain amount of rough language, and to occasional acts that are definitely inconsiderate and unkind.  There is no occasion for the law to intervene in every case where someone's feelings are hurt.  There must still be freedom to express an unflattering opinion, and some safety valve must be left through which irascible tempers may blow off relatively harmless steam.

*Roberts v. Auto Owners, supra*, 422 Mich. at 602-603, *quoting* Restatement 2d of Torts, § 46, comment d.

Applying these standards in this case, the evidence does not show that Defendants' conduct was "so outrageous in character, and so extreme in degree, as to go beyond all bounds of decency, and to be regarded as atrocious, and utterly intolerable in a civilized community" so as to allow Plaintiff to recover under this theory.

4.   DEFAMATION

Plaintiff also claims that Defendants defamed him.  That is, Plaintiff contends that by causing him to be arrested, and communicating that fact to (unknown) third parties,

28

the Defendants defamed him.  This claim fails as a matter of law.  Since probable cause existed to arrest Plaintiff, there is nothing defamatory about publishing the fact of his arrest to a third party.  Stated differently, there can be no defamation by stating the truth: Plaintiff was legally arrested.  *See Rouch v. Enquirer and News of Battle Creek*, 427 Mich. 157, 398 N.W.2d 245 (1986) (truth is an absolute defense to a claim of defamation).

5.    VIOLATION OF MINISTERIAL DUTIES

Finally, with regard to Plaintiff's claim in Count II denominated as "violation of ministerial duties," there is no such cause of action in Michigan.  Indeed, Plaintiff appears to understand this as he has not briefed or otherwise argued this claim in his Response Brief.  Therefore, this claim will also be dismissed.

CONCLUSION

For all of the foregoing reasons,

IT IS HEREBY ORDERED that Defendants' Motion for Summary Judgment is GRANTED.  Accordingly,

IT IS FURTHER ORDERED that Plaintiff's Complaint be DISMISSED in its entirety, with prejudice.

Let Judgment be entered accordingly.


                        s/Gerald E. Rosen
                        Gerald E. Rosen
                        United States District Judge

29

Dated:  June 8, 2006

I hereby certify that a copy of the foregoing document was served upon counsel of record on June 8, 2006, by electronic and/or ordinary mail.

s/LaShawn R. Saulsberry
Case Manager